UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDERSON R. DASILVA,

    Plaintiff,

v.                               Case No. 19-C-825

KYLE DEMERS, et al.,

    Defendants.

## DECISION AND ORDER

Plaintiff Anderson R. DaSilva, who is representing himself, is proceeding with a claim that the defendants violated the Eighth Amendment proscription of cruel and unusual punishment by using excessive force against him at the Waupun Correctional Institution on November 2, 2018, then failing to properly treat his injuries. Dkt. No. 18. On September 1, 2020, the defendants filed a motion for summary judgment. Dkt. No. 32. The motion is fully briefed and ready for decision. For the reasons explained below, the Court will grant the motion for summary judgment and dismiss this case.

## FACTS

At the relevant time, DaSilva was an inmate at the Waupun Correctional Institution (WCI). Dkt. No. 34, ¶1. The defendants were employed at WCI: Jacob Dorn, Kyle Demers, Nathan Pach, Jason Sonntag, and David Dingman were correctional officers; and Jennifer Kacyon and Robert Ahlborg were nurses. *Id.*, ¶¶2-3.

On November 2, 2018, DaSilva was housed in the Restrictive Housing Unit. *Id.*, ¶¶10-12. At around 5:30 p.m., Dorn went to DaSilva's cell to conduct a pat search before escorting DaSilva

to the recreation cells. *Id*., ¶¶11-12. Dorn explains that pat searches are common prior to an escort to make sure that an inmate is not bringing contraband with him to another location. *Id*., ¶12. During the pat search, Dorn felt a "balled-up" item in DaSilva's groin area, which he suspected was contraband. *Id*., ¶¶13-16. DaSilva admits that he had contraband in his pants—he states that he had been saving his prescription pills for a few days for the purpose of overdosing and he placed the pills in his pants when he heard the announcement that recreation would be at 5:30 p.m. that day. Dkt. No. 57, ¶1.

Dorn then took DaSilva to a holding cell to conduct a strip-search, and Pach assisted. Dkt. No. 34, ¶¶16-17. During the strip search, DaSilva attempted to place his hand down his pants several times. *Id*., ¶¶18-20. Each time, Dorn pulled out his Mark III OC streamer and ordered DaSilva to remove his hands from his pants. *Id*. At one point, DaSilva turned his back to Dorn and appeared to reach further into his underwear. *Id*., ¶20. Dorn then sprayed a one second burst of the OC streamer into the holding cell and continued to tell DaSilva to remove his hands from his underwear. *Id*., ¶21. DaSilva then brought his hands towards his mouth and Dorn sprayed another one second burst of the OC streamer into the holding cell. *Id*., ¶23. Dorn explains that he used the spray to prevent DaSilva from taking the pills and harming himself. *Id*., ¶22. According to DaSilva, Dorn used the entire bottle of OC spray during the two bursts. Dkt. No. 57, ¶2. DaSilva also states that he had already swallowed the pills after the first spray, so the second spray was unnecessary. Dkt. No. 58, ¶23.

About 15 seconds after the second OC burst, DaSilva dropped the balled-up item, turned to face staff, and placed his hands outside the trap so he could be restrained. Dkt. No. 34, ¶24. DaSilva was then secured to the door so that the officers could continue the strip-search. *Id*., ¶25.

The defendants have submitted videotape evidence, which shows what occurred next. *See* Dkt. No. 36-2.

Dorn, Pach, and Demers continued the strip-search. Dkt. No. 34, ¶¶26-35. DaSilva says that Dingman and Sonntag were also present; Sonntag held the camera and Dingman assisted when necessary. Dkt. No. 57, ¶¶3,5. The officers instructed DaSilva to kneel and face forward several times. Dkt. No. 34, ¶¶26-27, 30, 32, 35. The defendants explain that the requirement to face forward prevents "target glances," where an inmate looks at officers to determine their location/proximity in order to physically attack staff. *Id.*, ¶49. DaSilva was mostly compliant with the officers' orders, but he looked around a few times and asked when he'd be able to wash his face. *Id.*, ¶¶27-28, 30. Demers responded that he'd be able to wash his face as soon as possible as long as he remained compliant. *Id.*, ¶28. Demers then cut DaSilva's underwear from his body and used the backside of his bladed hand to check DaSilva's penis, scrotum, and buttocks for contraband. *Id.*, ¶¶29, 31. Demers also checked DaSilva's mouth, tongue, lips, and gumline for contraband. *Id.*, ¶34.

DaSilva received a "privacy wrap" for the escort to the showers and then to his cell in Bravo 012. *Id.*, ¶¶33, 36, 41. The defendants explain that it is common practice at the institution to give an inmate an opportunity to quickly rinse their face after the use of OC spray; the inmate can then do a more thorough rinse of their face once they return to their cell. *Id.*, ¶40. The officers escorted DaSilva through cell hall A to the showers to rinse the OC spray from his face. *Id.*, ¶36. Pach and Dorn instructed DaSilva to remain facing forward at all times while in the shower, they explained that any sudden movements would be perceived as a threat to staff, and they told him not to shake his head. *Id.*, ¶37. Pach and Dorn remained holding DaSilva's arms while he was in the shower. *Id.*, ¶38. DaSilva complained that the water from the shower caused OC spray to get

3

into his eyes, *see* Dkt. No. 57, ¶5, so his face was pat dried, *see* Dkt. No. 34, ¶39. DaSilva explains that, from this point forward, he could not see very well. Dkt. No. 57, ¶5.

Pach and Dorn remained holding DaSilva's arms as he was escorted to Bravo 012. Dkt. No. 34, ¶41. As they approached the stairs, Dorn told DaSilva to watch his step and step forward. *Id*., ¶42. DaSilva complained he could not see, so Dorn attempted to tell DaSilva when to step down to help him navigate the stairs. *Id*. DaSilva continued to look around, and Demers and Dorn continued to tell DaSilva to face forward. *Id*., ¶43. DaSilva then shouted, "You gotta clean my fucking eyes, man." *Id*., ¶44.

At this point, Pach and Dorn secured DaSilva's body against the stairway wall. *Id*., ¶45. Demers secured DaSilva's head by placing one hand on DaSilva's forehead and his other hand on DaSilva's chin and holding it while telling him to relax. *Id*. The defendants explain that this is a trained technique staff use to prevent inmates from moving their head from side to side to target glance or to resist. *Id*. Requiring inmates to face forward during escorts protects the officers from headbutts and spitting. Demers then asked DaSilva multiple times if he understood the order to face forward. *Id*., ¶46. DaSilva responded, "I'm not doing nothing, man." *Id*., ¶47. Demers then explained to DaSilva that he had turned toward staff despite being reminded to face forward several times; they explained that DaSilva had failed to follow multiple directives to remain facing forward. *Id*., ¶¶47-48.

Pach and Dorn then escorted DaSilva the rest of the way to his cell while Demers secured his head in accordance with the institution's procedure. Dkt. No. 34, ¶50. Once they reached his cell, the officers removed DaSilva's handcuffs. *Id*., ¶51. Dingman told DaSilva to stop tensing up his arms and to stop resisting. *Id*. Demers then asked DaSilva if he would listen to staff if they released his head, and DaSilva replied yes. *Id*., ¶52. Demers released DaSilva's head and told

him not to turn toward staff. *Id*. DaSilva was instructed to face forward and kneel so his leg restraints could be removed. *Id*., ¶53. Staff then instructed DaSilva to face the cell wall until staff left his cell. *Id*. DaSilva's privacy wrap was removed, and he was given a kilt to wear. *Id*., ¶54. DaSilva was then placed on control status. *Id*., ¶55.

DaSilva states that, following the escort, he had bruises on his face, neck, arms, and forehead from the incident. Dkt. No. 57, ¶10. He asked for medical care, and Ahlborg and Kacyon examined him a short time later. *Id*., ¶11-15. DaSilva states that Ahlborg and Kacyon provided inadequate medical care because they did not send him to the hospital to see a doctor. *Id*.

DaSilva filed three inmate complaints through the Inmate Complaint Review System related to the excessive force claims against Dorn, Demers, Pach, Sonntag, and Dingman. Dkt. No. 34, ¶8. DaSilva did not file any inmate complaints related to the medical care claims against Kacyon and Ahlborg. *Id*., ¶9.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show

that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Exhaustion of Administrative Remedies

"[N]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). "To satisfy the exhaustion requirement, an inmate must take each of the steps prescribed by the state's administrative rules governing prison grievances." *See Chambers v. Sood*, 956 F.3d 979, 983 (7th Cir. 2020) (citing *Lockett v. Bonson*, 937 F.3d 1016, 1025 (7th Cir. 2019)). "The primary justification for requiring prisoners to exhaust administrative remedies is to give the prison an opportunity to address the problem *before* burdensome litigation is filed." *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006); *Schillinger v. Kiley*, 954 F.3d 990, 995-96 (7th Cir. 2020)).

Wisconsin has established the Inmate Complaint Review System (ICRS) to review inmate grievances. Wis. Admin. Code §DOC 310.05. Inmates must file an inmate complaint with the Institution Complaint Examiner (ICE) within 14 days of the relevant occurrence. Wis. Admin. Code §DOC 310.07(2). An inmate who does not file an inmate complaint has not exhausted administrative remedies. *See, e.g.*, *Streckenbach v. Meisner*, 768 F. App'x 565, 569 (7th Cir. 2019) (concluding that the district court "properly" determined that a plaintiff failed to exhaust his remedies against the defendants when he "did not file any inmate complaints against them").

6

The defendants state that they are entitled to summary judgment with respect to the medical care claims against Ahlborg and Kacyon because DaSilva did not file any inmate complaints regarding his medical care. Although DaSilva concedes that he did not file an inmate complaint related to his medical care, he asserts that the Court should excuse his error because it can be inferred from his inmate complaints regarding his excessive force claims that Ahlborg and Kacyon failed to provide insufficient medical care after the incident. *See* Dkt. No. 58, ¶9. Because DaSilva's inmate complaints do not reference any claim related to medical care from Ahlborg or Kacyon, he failed to provide sufficient information to allow the institution to investigate and provide a decision on an inmate grievance about DaSilva's medical care. As a result, DaSilva failed to his exhaust administrative remedies with respect to his medical care claims against Ahlborg and Kacyon. Ahlborg and Kacyon are therefore entitled to summary judgment on this basis.

**B. Excessive Force**

To survive summary judgment on an excessive force claim, DaSilva must present evidence from which a reasonable jury could conclude that the defendants applied force maliciously and sadistically to cause harm rather than in a good-faith attempt to maintain or restore discipline. *Caffey v. Maue*, 679 F. App'x 487, 491-92 (7th Cir. 2017); *see also Jackson v. Angus*, 808 F. App'x 378, 382 (7th Cir. 2020). The Court examines "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019).

DaSilva claims that there are several disputes of fact that preclude summary judgment. He disputes the defendants' version of events and states that the defendants "hit him on the right side of his face;" "choked him;" "twisted his arms;" "pushed their fingers into [his] eyes;" and "hit [him] head on." Dkt. No. 57, ¶¶7-10. DaSilva also states that he was complying with "all" of the defendants' orders and describes the defendants' demeanor as angry and increasingly "aggressive." *Id*.

DaSilva's assertions, however, are blatantly contradicted by videotape evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Videotape evidence clearly shows DaSilva looking around (i.e. refusing to face forward) throughout the video, including twice right before he was stabilized against the wall. *See* Dkt. No 36-2 at 7:40 and 7:45. DaSilva therefore was not complying with "all" of the defendants' orders as he purports. Further, at no point during the video do any of the defendants hit him on the right side of his face, choke him, twist his arms, push their fingers into his eye, or hit him head on. At around eight minutes into the video, Demers secures DaSilva's head by placing one hand on his forehead and one hand under his chin. *See* Dkt. No. 36-2 at 8:00. Demers' hands are close to DaSilva's eyes given the proximity of the eyes to the forehead, but Demers does not push his fingers into DaSilva's eyes. No reasonable jury could watch the videotape and come to any other conclusion.

DaSilva argues that, around ten minutes into the video, the defendants' backs cover the screen for about 30 seconds. *See* Dkt. No. 58, ¶51; *see also* Dkt. No. 36-2 at 9:59-10:35. He states that the defendants intentionally did this to cover up their purported assault at his cell. However,

the brief moments when DaSilva is out of the camera's view does not preclude summary judgment. *See, e.g.*, *Boyd v. Pollard*, 621 F. App'x 352, 355-56 (7th Cir. 2015).

In *Boyd*, the plaintiff alleged that guards used excessive force during a cell extraction when they body-slammed him onto a concrete floor, placed him in a chokehold, and hit him in the face and head. *Id*. at 354. The defendants denied these allegations and a video confirmed most of the defendant's account, except for brief times when the plaintiff was out of the camera's view. *Id*. The Seventh Circuit recognized that certain portions of the video were inconclusive and that the parties had presented different versions of the events. *Id*. But it nonetheless determined that "no juror who viewed the video could reasonably conclude—given the professional behavior of [the defendants] and minor injury sustained by [the plaintiff]—that the guards, when outside the camera's view, attacked [the plaintiff]." *Id*. at 356.

The same is true in this case. The video clearly shows that the defendants acted professionally throughout the escort. They calmly gave DaSilva instructions on what to do, and they never yelled or screamed at him. Despite the fact that DaSilva was refusing the defendants' orders to face forward throughout the incident, the defendants only used a minimal amount of force to stabilize him against the wall when DaSilva began to yell and get frustrated. The video also shows that the defendants used a trained technique to secure his head and body. While it may have been uncomfortable to walk backwards while the head is secured, that discomfort was the result of DaSilva's resistance. Further, once they arrived at his cell, there are no sounds indicating that the defendants were choking him, twisting his arms, or hitting him against the wall. It is clear from viewing the videotape in its entirety that the officers' use of force was reasonable. No reasonable jury could credit DaSilva's version of what happened and find in his favor.

DaSilva briefly makes two other related but slightly different arguments. *See* Dkt. No. 56. First, he states that Dorn touched his groin during the initial pat search when he located the balled-up item in his pants. *Id.* at 6. Given that DaSilva admits that he placed his pills down his pants, some incidental touching of his groin is reasonable. DaSilva should not have placed items down his pants if he did not want officers to search his groin area. Second, DaSilva states that Dorn was required to get "authorization" from a lieutenant before conducting a strip-search. *Id*. at 12. Dorn states that he complied with this requirement, *see* Dkt. No. 34, ¶16, and DaSilva's assertion to the contrary is pure speculation. In any event, the requirement to get authorization for a strip-search is a prison policy. Violation of prison policy does not establish a constitutional violation. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

Based on the record, no reasonable jury could credit DaSilva's version of events and find in his favor. The defendants are therefore entitled to summary judgment, and the Court will dismiss this case. The Court will also deny DaSilva's motions to expedite the case as unnecessary.

## CONCLUSION

For these reasons, the defendants' motion for summary judgment (Dkt. No. 32) is **GRANTED**. The plaintiff's motions to expedite the case (Dkt. Nos. 60-61) are **DENIED** as moot. This case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 17th day of May, 2021.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge